IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WILLIAM McCAFFREY,<br><br><br><br>Debtor. | Chapter 13<br><br>Case No. 09-bk-20635-SSC<br><br>Adv. No. 10-ap-01121-SSC<br><br>(Not for Publication- Electronic Docketing ONLY) |
| WILLIAM McCAFFREY,<br><br>                              Plaintiff,<br><br>v.<br><br>DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee of Residential Asset Securitization Trust Series 2004-1 under the Pooling and Servicing Agreement dated February 1, 2004, et al,<br><br>                              Defendants. | <br><br><br><br><br><br><br><br><br><br>MEMORANDUM DECISION |

I. INTRODUCTION

William McCaffrey, the Debtor in the above-captioned administrative case, commenced this adversary against Deutsche Bank National Trust Company, as Trustee of Residential Asset Securitization Trust Series 2004-1 under the Pooling and Servicing Agreement dated February 1, 2004 ("Deutsche Bank") by filing a Petition for Temporary Restraining Order and Preliminary Injunction on June 18, 2010 to prevent an impending Trustee's sale after the Court lifted the automatic stay in favor of Deutsche Bank. Upon inspection of the underlying

1

original Note and Deed of Trust, an issue arose as to whether Deutsche Bank was, in fact, the actual holder of the Note and the beneficiary under the Deed of Trust on the Debtor's residence. The Court held a number of hearings, issued a preliminary injunction, and held final argument on June 28, 2011.[1] The matter was deemed under advisement at that time, and the Court ordered the injunction to remain in place until the Court rendered its decision.

Taking into account the evidence presented at trial, the arguments of the parties, the documents filed, and the entire record before the Court, the Court has set forth in this decision its findings of fact and conclusions of law pursuant to Fed .R. Civ. P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§ 1334(b) and 157(b) (West 2011).

## II. FACTUAL BACKGROUND

On August 25, 2009, the Debtor filed a voluntary petition under Chapter 13 of the Bankruptcy Code. The Debtor is the owner of certain real property located at 8335 East Sutton Drive, Scottsdale, Arizona ("Property"). The Property is the Debtor's principal place of residence.

On or about August 25, 2003, the Debtor and his then wife Elizabeth McCaffrey executed a Promissory Note ("Note") in favor of IndyMac Bank FSB ("IndyMac"), secured by a Deed of Trust on the Property. The original principal amount on the Note was $479,500.00. The Debtor agreed to pay the amount of $2,465.30, or more, beginning on October 1, 2003. Deutsche Bank states that on or about July 11, 2008, IndyMac was closed by the Office of Thrift Supervision, the Federal Deposit Insurance Corporation ("FDIC") was subsequently appointed

---

**1.** The Court conducted hearings on August 11, 2010, October 27, 2010, May 17, 2011, and June 28, 2011. For a variety of reasons, the parties stipulated to prolonged continuances of the trial in this matter. In certain cases, the continuances were prompted by the unavailability of Debtor's counsel; in other cases, the creditor needed additional time to retrieve original documents. The Court also needed to find time in its schedule when the parties were ready to proceed.

the receiver, and substantially all of the assets of IndyMac were transferred to IndyMac Federal Bank, FSB ("IndyMac Federal").[2] The FDIC was then named as the conservator of IndyMac Federal.[34] Around March 19, 2009, the FDIC, then as Receiver of IndyMac and Indy Mac Federal, authorized certain individuals to act on its behalf with respect to a "Loan Sale Agreement, dated as of March 19, 2009," to transfer certain assets ultimately to OneWest Bank ("OneWest").[5] Deutsche Bank also submitted another document which focuses on One West acting as a servicer for Deutsche Bank under various Pooling and Servicing Agreements as set forth on an attachment.[6] Finally, Deutsche Bank submitted an Assignment of the Deed of Trust by IndyMac, not IndyMac Federal, purporting to assign the Deed of Trust to Deutsche Bank National Trust Company, as Trustee of Residential Asset Securitization Trust Series 2004-IndyPort1, Mortgage Pass-Through Certificates, Series 2004-1 ("Deutsche Bank") on October 13, 2009.[7]

Deutsche Bank filed a Motion for Relief from the Automatic Stay ("Motion") on

---

**2.** See Deutsche Bank's Bench Memorandum dated May 16, 2011, at page 2, n. 2, Docket Entry No. 55, and Exhibit F.

**3.** Erica Johnson-Seck was one of the employees of IndyMac Federal specifically designated in the Limited Power of Attorney to act on the transfer of assets from IndyMac to IndyMac Federal. Exhibit F, and Exhibit A thereto.

**4.** Exhibit F.

**5.** Exhibit G. Erica Johnson-Seck was designated one of the employees to act as a part of this transaction.

**6.** Exhibit H. On Exhibit A thereto, one of the Agreements listed is "Investor No. 344, IndyPort 2004-1, with a closing date of February 24, 2004. This appears to be the same Pooling and Servicing Agreement referred to in this Adversary Proceeding as the Pooling and Servicing Agreement dated February 1, 2004, but it would have been helpful if Deutsche had tied these documents together.

**7.** Exhibit C. However, it is unclear why the document was executed in October 2009, and why the document refers to IndyMac Bank, F.S.B. as the assignor, when the McCaffrey loan would have been placed in the pool of securitized loans in 2003.

3

1   November 25, 2009. Attached to the Motion were a copy of the Note in favor of IndyMac, the

2   Deed of Trust, and the October 13, 2009 Assignment.  In its Motion, Deutsche Bank stated it was

3   the holder of the Note secured by the Deed of Trust, and thus a real party in interest. At the time

4   of the filing of the Motion, the Debtor had failed to make monthly payments beginning with

5   December 1, 2008, with a post-petition delinquency of $52,468.35. A supplemental declaration

6   filed by Deutsche Bank on January 8, 2010 sets forth the post-petition delinquency at

7   $55,073.73.

8             An objection to the Motion was filed, and a hearing was set for February 2, 2010.

9   The February 2, 2010 hearing was continued to March 2, 2010 to give the parties the opportunity

10   to review the original note. At the March hearing, the Court held that Deutsche Bank presented a

11   prima facie case for stay relief, and ordered vactur of the stay. The order granting the Motion

12   was signed on March 12, 2010.

13             On June 18, 2010, the Debtor initiated the above-captioned adversary proceeding

14   by filing a petition for a temporary restraining order and preliminary injunction. The Debtor

15   sought to prevent an impending Trustee's Sale of the Property set for June 22, 2010. In his

16   petition, the Debtor argued that the Note presented to the Court was materially different from the

17   original Note provided to the Debtor for inspection. Of significance was the color difference

18   between the Note and the endorsement.  The original Note had an aged color, whereas  the

19   endorsement looked new. The Debtor provided an affidavit from Mark Fitzpatrick, the individual

20   whose stamped signature appears as part of the indorsement in blank on the Note.  Mr.

21   Fitzpatrick stated in his affidavit that he did not execute the indorsement in blank in the manner

22   presented to the Court.

23             The Court issued a temporary restraining order on June 21, 2010 and set a

24   hearing on whether a preliminary injunction should issue on June 29, 2010.  The Court

25   determined that an injunction under 11 U.S.C. §105 should issue and remain in place, and set a

26   another hearing for August 11, 2010. The Court was unable to conclude the hearing on August

27

28                                 4

1  11, 2010, and further hearings were conducted over the last year.  The Debtor was directed to file

2  a Complaint, and did so.  The Debtor ultimately requested that the underlying security

3  instruments be set aside, and the loan be deemed unsecured for purposes of the Debtor's Chapter

4  13 plan.  Because of the Debtor's allegations of fraud and alteration of original loan documents,

5  the Court directed that the original documents be placed in the Court's safe, and those documents

6  have remained in the Court's safe during these proceedings.  On June 28, 2011, the parties

7  presented their final witnesses and closing arguments.

8                              A.  The Original Loan Documents

9                 During the course of this Adversary, the parties presented conflicting evidence as

10  to the original loan documents executed by William McCaffrey, the Debtor, as a part of the close

11  of escrow of the loan on his principal residence.[8]  Unfortunately, the title company that handled

12  the McCaffrey loan transaction, Arizona Title Agency, Inc., went out of business in 2008.

13  Whatever records it held were transferred to its successor, First American Title Company

14  ("FATCO").  Counsel for Deutsche Bank stated on the record on June 28, 2011 that only certain

15  records were electronically transferred to FATCO, such as the title insurance policy and only

16  certain documents that had been recorded.[9]  Therefore, for the Court's review of the original loan

17  documents, it has been provided with the original custodial loan file of Deutsche Bank, held by

18  its custodian of records, OneWest.  The file contains what was received by IndyMac at the close

19

20  _____

21  **8.** Because there has been a dispute between the parties as to whether the original Note
   was properly endorsed and whether some of the original documents had been altered, the Court

22  has placed the documents that it reviewed from the original loan file on the docket as Court
   Exhibit 1.  The Court is able to use two-side copying, so the documents on the docket are as they

23  appeared in the original loan file.  The Court has utilized this procedure so that it may return the
   original loan file to Deutsche Bank and the copies of the closing documents to William

24  McCaffrey who separately maintained a file of the loan documents that he received at the closing
   of the loan.

25

26  **9.** At the hearing on June 28, 2011, counsel for Deutsche Bank stated that he had issued a
   Fed. R. Civ. P. 30(b)(6) notice of deposition and subpoena to obtain whatever documents

27  FATCO had in its file as successor- in-interest to Arizona Title Agency, Inc.

28                                          5

of escrow from Arizona Title and what was returned to IndyMac by the Recorder of Maricopa County, Arizona.

The original Note is in the principal amount of $479,500.00, was executed by William McCaffrey, the Debtor, on August 25, 2003, and IndyMac is designated the Lender.[10] The Loan Number for the transaction is located on the bottom left of each page of the Note. Although only the Debtor executed the Note, the bottom right of each page of the Note has the initials of the Debtor and some other individual.[11]  On the first page of the Note, the font appears the same, except in Paragraph 4(A), which focuses on the first day that the adjustable interest rate will change.[12]  However, the Court has also reviewed the documents retained by the Debtor when his loan closed.  His documents also have the same date inserted into Paragraph 4(A), so the Court concludes that any date inserted into the Note was pursuant to the agreement of the parties.  Of critical importance to the dispute is the endorsement.  The Court has reviewed the back of the last page of the original Note and confirms that it has a stamp on it, but the stamp is in the nature of a blank endorsement and says:

> "Pay to the Order of
>
> Without Recourse
>
> IndyMac Bank, FSB."

Beneath the endorsement is the **stamped** signature of Mr. Fitzpatrick, and underneath the signature, it states "Mark Fitzpatrick, Vice President, Operations-Retail Lending."  The original Note is complete, and the Court cannot find anything unusual or suspect as to how the Note is set up.  The Court concludes that the original Note is proper on its face, and does not reflect any

---

**10.** This Note is consistent with what has been admitted in evidence as Exhibit A.

**11.**  The Court is unable to determine whose initials have been placed on the Note with William McCaffrey's.

**12.**  Specifically, the Court is referring to the date "September 1, 2008" which has been inserted in that Paragraph in a slightly different font.

6

1  evidence of fraud.

2          The original loan file also contains an incomplete Arizona Assignment of Deed of

3  Trust, with a date of September 10, 2003, and executed by "Mark Fitzpatrick, Vice President."[13]

4  The document does not reflect (the area is blank) any assignee, and the recording information for

5  the McCaffrey Deed of Trust has also been left blank.  Of concern to the Court is the fact that the

6  incomplete document has been notarized.  There is a second Assignment of a Deed of Trust also

7  contained in the original loan file.[14]  This document also lists IndyMac, and requests that when

8  recorded, the document be returned to the Bank.  The document is blank as to the assignee and

9  contains no recording information as to the original Deed of Trust.  The Assignment was

10  apparently executed by Mark Fitzpatrick, as "Vice President," on October 1, 2003.  Of concern

11  to the Court is the fact that this incomplete document has also been notarized.  Finally, the

12  original loan file contains a **third** Assignment of a Deed of Trust.[15]  This document contains no

13  information reflecting that it was recorded.  It states that after recordation, it should be returned

14  to OneWest.  This document states that IndyMac has assigned its interest in the Deed of Trust to

15  Deutsche Bank.  It refers to the Deed of Trust executed on August 25, 2003 by William

16  McCaffrey and Elizabeth M. McCaffrey, with the recording information for the Deed of Trust,

17  and notation that Charles A. Brown was the Trustee under the Deed of Trust.  This document is

18  dated and notarized on October 13, 2009, in Travis County, Texas, and has Erica A. Johnson-

19  Seck listed as the "Attorney-in-Fact" for IndyMac.  This document was loose in the loan file, and

20  did not have a two-hole punch at the top which would have allowed it to be securely placed in

21  the file.

22

23

24  _____

25      **13.** This document is consistent with what has been admitted as Exhibit E.

26      **14.** This document is consistent with what has been admitted as Exhibit D.

27      **15.** This document is consistent with what has been admitted as Exhibit C.

28                                              7

The next document in the original loan file is the Deed of Trust.[16]  There is no recording information reflected on the document, but the document is "certified to be a true and exact copy of the original."  It reflects that when the document has been recorded, it is to be returned to IndyMac.  This document has the Loan Number in the lower left corner of each page.  IndyMac is listed as the lender, and the Debtor and his then wife, Elizabeth M. McCaffrey, executed the Deed of Trust as "Borrowers," although Elizabeth McCaffrey did not execute the Note.  The Deed of Trust was notarized on August 25, 2003.  The Trustee is listed as "Charles A. Brown," who resides in "Pasadena, Texas."  Of importance to the Court is that the Deed of Trust does **not** have the Mortgage Electronic Registration System, Inc.("MERS") listed as the nominee for the Lender.[17]  Related to the Deed of Trust, the original loan file also contains a Fixed/Adjustable Rate Rider dated August 25, 2003, which is incomplete.  There is no signature page, so it is unclear who executed the document.[18]  Because Deutsche Bank is unable to produce the original fully executed Rider, the Court will disregard said document for the purposes of this Decision.

Deutsche Bank has proceeded before this Court as the Trustee of Residential Asset Securitization Trust, Series 2004-IndyPort 1, Mortgage Pass-Through Certificates, Series 2004-1, under the Pooling and Servicing Agreement, dated February 1, 2004, its assignees or

---

**16.** This document is consistent with what has been admitted as Exhibit B.

**17.** Therefore, the issues raised in this Adversary are somewhat unique.  Since IndyMac did not use the MERS system, any beneficiary under the Deed of Trust would need to follow all of the procedures required under Arizona law to transfer any interest in the underlying Deed of Trust.

**18.** Although the Rider has initials at the bottom of pages 1-3, there is no page 4 with the signature of the party to be bound.  On the first page of the Rider, the Loan Number is at the top, rather than in the bottom left corner.  The other pages of the incomplete document have the Loan Number in the lower left corner.  Mr. McCaffrey and some other party have initialed the Rider in the lower right-hand corner.  Counsel for the Creditor indicated that he had no document which contained all pages that were executed by William McCaffrey.  He stated that even the recorded Deed of Trust did not have a complete Rider attached to it.

successors, but no individual from Deutsche Bank has testified before this Court as to how the McCaffrey loan was placed in the subject Residential Securitization Trust.[19] Without such testimony, the Court is unable to conclude, as a matter of fact, that Deutsche Bank is the appropriate party to proceed with any foreclosure on the Deed of Trust concerning said loan.

B. The Deposition of Brian Brouillard

Deutsche Bank relied on the deposition of Mr. Brian Brouillard to describe how loan transactions were handled by IndyMac during the time period of 2001 through 2007, when Mr. Brouillard was with IndyMac. However, Mr. Brouillard was assigned to the Southeastern Operations area, in Atlanta, Georgia, and focused on the loan originations that were part of the "wholesale function," which were originated by mortgage brokers or mortgage bankers. The Debtor did not obtain his loan in such a manner. As an employee of IndyMac at the time, he utilized the internal mortgage loan services division of IndyMac, VIP Lending. This was a separate loan group, and the Debtor's testimony was that the procedures were different. Counsel for Deutsche Bank responds that they are no longer able to locate any employees that would have knowledge of how the IndyMac employee loans were processed, but Mr. Fitzpatrick did have such knowledge, he did testify before this Court during the trial, and he was subject to cross examination by Deutsche Bank.

Mr. Brouillard testified that during the securitization process, once a "pool of

---

**19.** Exhibit 1, which was not admitted in evidence, appears to be the Pooling and Servicing Agreement from February 1, 2004. It has numerous terms and conditions about how to convey a mortgage loan into the Trust, which entity will service the loans in Trust, which entity will act if there is a default under the loans or the Pooling and Servicing Agreement, etc. Of concern is the fact that the Agreement apparently required that to place a mortgage loan in the Trust, there had to be a duly executed assignment of the mortgage loan in a form that could be recorded. A blanket assignment was a permissible form to be utilized. See Exhibit 1 at 33, Article Two, Section 2.01(c)(iii). The Agreement further provided that the delivery of the original mortgage loan and each interim assignment were to be made within one year following the closing date of the mortgage loan. See Exhibit 1 at 35, Section 2.01(c)(vi)(F). Given this Court's factual findings, the Court is unable to conclude on this record that the McCaffrey loan was ever placed in the Trust as to which Deutsche Bank serves as the Trustee.

9

loans" was closed by IndyMac, the loan documents, including the notes, mortgage security

instruments, and the alonges, were delivered to a custodian, which was usually Deutsche Bank.[20]

However, no individual from Deutsche Bank testified as to what happened to the McCaffrey

loan. If Deutsche Bank was the original assignee, they could have easily presented evidence

clarifying the point. They did not. Moreover, the original loan file does not reflect any initial

assignment of the McCaffrey loan. Indeed, as noted, the 2003 Assignments of the Deed of Trust

were incomplete, yet notarized. Deutsche Bank provided no evidentiary or documentary

evidence to explain what happened to the McCaffrey loan from 2003 until 2009, when the first

completed Assignment of the Deed of Trust was placed in the original loan file. Thus, although

Mr. Brouillard testified at length as to how his division worked in the Southeast and how a stamp

was utilized for his signature to assist in the securitization process, he was not necessarily

focused on the issues that this Court is analyzing. The Court does note certain helpful points.

For instance, Mr. Brouillard's deposition transcript was credible when he testified at length as to

the processing of the IndyMac loans, including that because the loans were generally sold or

assigned by IndyMac, in bulk, and quickly transferred to assignees, rather than held in

IndyMac's portfolio, stamps with the officer's signature and blank endorsement were used to

expedite the process.[21] However, Mr. Brouillard conceded that he was only "vaguely" familiar

with the VIP Lending division of IndyMac that actually made the loan to the Debtor.[22]

Mr. Brouillard was shown a copy of the Debtor's Note. Although he had no

personal knowledge as to how the McCaffrey loan was handled or processed, he stated that

"every office" of IndyMac utilized the stamp in their "postclosing areas."[23] However, the

---

**20.** Deposition of Brian Brouillard at 15, Lines 12-22, Exhibit L.

**21.** See, for instance, the Deposition of Brian Brouillard at 15-25, 30-34, Exhibit L.

**22.** Deposition of Brian Brouillard at 36-38, 42, Lines 18-25, and 46, Line 1, Exhibit L.

**23.** Deposition of Brian Brouillard at 26-28, Exhibit L.

10

evidence in this matter reflects that because the Debtor was an employee of IndyMac, his loan might have been originally held in the Bank's portfolio.[24] This is the only logical conclusion given that the 2003 Assignments of the Deed of Trust, contained in the original loan file, are incomplete. Although there might have been an indication that the McCaffrey loan would be assigned, for whatever reason, that probably did not occur. At least the Court was provided with no clear evidence from Deutsche Bank reflecting the transfer of the McCaffrey loan to the Trust under the Pooling and Servicing Agreement dated February 1, 2004.

### C. The Testimony of Mark Fitzpatrick

On August 11, 2010, Mr. Mark Fitzpatrick was called as one of the Debtor's critical witnesses.[25] It is after all, Mr. Fitzpatrick's endorsement which purportedly appears on the original Note and the numerous copies thereof. He testified that he has worked sixteen years in the mortgage banking industry, including serving as the Vice President, Operations-Retail Lending at IndyMac. He worked at IndyMac from April 2000 through September 2004. $9,000,000 in loans were under his management. Mr. Fitzpatrick was in the retail banking group and set up appropriate processes, from origination to closing, concerning those loans which were securitized. His duties also included the underwriting of loans, including evaluation of an applicant's ability to repay a loan. He also was involved in the auditing function after the loan was closed and funded, ensuring, for instance, that the loan package was complete.[26]

He testified that the subject loan of the Debtor was originated in 2003. After reviewing the history and documents for the loan, he stated that the McCaffrey loan was funded in August 2003. He believed that the McCaffrey loan was then transferred, as part of a pool of

---

**24.** Deposition of Brian Brouillard at 14, Lines 6-16, Exhibit L. Mr. Brouillard conceded that certain loans were indeed retained by IndyMac in its portfolio. Why not this loan?

**25.** It was the affidavit of Mr. Fitzpatrick which caused this Court to issue the temporary restraining order in the first instance.

**26.** He testified that as a part of the post-closing audit, a high percentage of the loans needed to be checked.

11

securitized loans in 2004, but agreed that his analysis was predicated on the documents that Mr. McCaffrey, the Debtor, had provided to him just prior to his testimony. He stated that he recalled the McCaffrey loan because he was processing, underwriting, and reviewing the post-closing loan documents of VIP loans, which consisted of loans made to employees of the Bank at a certain management level, and the McCaffrey loan was within the VIP loan division at the time of its closing. He believed that the VIP loans had "different" or "higher" standards.

Mr. Fitzpatrick was shown a copy of the original Note and asked where he usually affixed his signature for endorsement purposes.[27] He testified that he "was absolutely certain" that given the substantial amount of space at the bottom of Pages 4 or 5 of the Note, he would have affixed the endorsement on one of those Pages. Although he might have used a stamp which would have incorporated such words as "pay to the order of" or had his name and title, he would have personally signed his name on the signature line.[28] He also testified that he had a unique way of signing his name, which allowed him to distinguish his signature from the signature of others. In reviewing Exhibit A, he testified that he would have placed his endorsement on Pages 4 or 5, not on the back of the Note where the alleged endorsement was placed.[29] He testified that the signature on the endorsement on Exhibit A was not his signature, and that the signature appeared to be a copy of his signature.[30] Mr. Fitzpatrick, however, also

**27.** He was shown Exhibit A.

**28.** The stamp would have included such words as "Pay to the Order of Without Recourse, IndyMac Bank, FSB, a signature line, and then beneath the signature line, "Mark Fitzpatrick, Vice President, Operations-Retail Lending." This stamped endorsement would have allowed Mr. Fitzpatrick to place his signature, in pen, on the line. He described this as placing his "wet signature" or his signature "from a pen" on the line.

**29.** To be clear, he designated the pages as Bates Stamp 00007 or 00006 on Exhibit A. The endorsement on Exhibit A was actually placed on the back of Page 5 of the Note, Bates Stamp 00008.

**30.** Actually as described more completely above, the Court has reviewed the original Note and concludes that the endorsement on the back is a stamp which includes the signature of Mr. Fitzpatrick in its contents. Thus, there was no wet signature or pen signature on the original

12

conceded that he managed an area that processed 8,000 to 9,000 loans, many of which would have required his signature on an endorsement. It is not inconceivable that IndyMac utilized a stamp containing Mr. Fitzpatrick's signature to expedite the securitization process. Mr. Fizpatrick left the employment of IndyMac in 2004, approximately seven years ago. Certainly some of his recollections are not as clear or as precise as they should be or would have been if he had testified shortly after the McCaffrey loan closed. The Court concludes that on this record, it cannot find the use of the stamp with Mr. Fitzpatrick's signature to be fraudulent or improper.

Mr. Fitzpatrick also reviewed the original Assignment of the Deed of Trust/Mortgage, dated October 1, 2003, which had his signature in blue ink.[31] He stated that he knew the notary, that he worked with her at the time in 2003, but that the signature on that document was not his signature.[32] He also stated that he had no reason to believe that she would make a false statement. He testified that because of the volume of loans that he executed, he had a stylized signature, and the Assignment did not contain his stylized signature. The Court has reviewed the original Assignment contained in the loan or custodial file, and agrees that the signature does not appear to match the signature of Mr. Fitzpatrick. The Assignment is incomplete, in that no assignee is designated. The Assignment has been notarized although incomplete.[33] Mr. Fitzpatrick also reviewed another Exhibit which consisted of an Assignment of the Deed of Trust, dated September 10, 2003, entitled "Arizona Assignment of Deed of Trust," which had his signature in black ink and was notarized by the same individual who

_____

Note, just a stamped signature incorporated into the endorsement.

**31.** Exhibit D.

**32.** Although difficult to read, the document was notarized by Lorrina M. Velasquez.

**33.** This has been described by the Court above as the Second Assignment of the Deed of Trust. The Assignment in the original loan file appears to have a "wet" or "pen" signature on it, but it does not match the signature of Mr. Fitzpatrick on Exhibit A.

notarized the October 2003 Assignment.[34]  Again, he was skeptical that said document contained

his signature, but conceded that he knew of no reason why she would falsely notarize a

document and knew of no problems with her while she worked at IndyMac.[35]

### D.  The Testimony of Douglas Rhoads

On August 11, 2010, Mr. Rhoads was called by counsel for Mr. McCaffrey, since

Mr. Rhoads had inspected the original Note.  He testified that he went to the law offices of

McCarthy, Holthus & Levine, who were representing Deutsche Bank concerning a motion for

relief from stay ("Motion") as to the Debtor's Property, about a month after the Motion was filed

in January 2010.  He noted that there was a white-out on the Note, although it was certified to be

a true and correct copy of the original.  He also stated that the endorsement was placed on a

separate sheet of paper which was white and appeared to be a xerox copy of another document.

He noted that the pigment of the sheet containing the endorsement did not match the pigment of

the other pages of the copy.  Because this Court has had the opportunity to review the original

Note in the loan file, this testimony is largely irrelevant to the Court's decision.  However, the

Court agrees that Exhibit 4 reflects the unfortunate problem of Deutsche Bank, or its counsel,

presenting a document to the Court which is stamped "This Is Certified To Be A True And Exact

Copy Of The Original," that is not a true and exact copy.[36]

### E.  The Testimony of William McCaffrey

Mr. McCaffrey, the Debtor, testified before this Court on August 11, 2010, and

---

**34.** Exhibit E.

**35.** On redirect, Mr. Fitzpatrick stated that he had developed a certain form or rhythm in his signature, over the years, and that Exhibits D and E did not exhibit that flow or rhythm.

**36.** Mr. Rhoads noted a number of inconsistencies between Exhibit 3 and Exhibit 4.  The Court concludes that Exhibit 4 was not, and is not, a true and exact copy of the original Note. For instance, the loan number is on the lower left-hand corner of the original Note, and there is no endorsement on the back of page 5 of Exhibit 4.

14

June 28, 2011.[37]  He stated that he has been in the banking business for 30 years, with his family having been in the banking business since his grandfather started a business in 1938.  He testified that he has worked for four different federally chartered financial institutions.  He worked for IndyMac from March 1, 1997, through March 2007, and he currently has his own business as a forensic auditor of loan documents.  He stated that he was familiar with pooling agreements, promissory notes, deeds of trust, underwriting agreements concerning the selling and pooling of loans.  He testified that he was familiar with the type of endorsements placed on promissory notes by employees of IndyMac.

The Debtor was shown Exhibit F, which appears to be a Limited Power of Attorney authorizing the FDIC to take certain action as the receiver of IndyMac, including authorizing certain employees of IndyMac Federal to assign, convey, or transfer without recourse the loans of IndyMac or real property securing said loan.  Ms. Erica Johnson-Seck is one of those individuals listed on the Exhibit who had the authority to act for the FDIC concerning assignments of real property.  However, the Limited Power of Attorney has an effective date from July 25, 2008, through July 25, 2009.  Unfortunately, the operative Assignment of the Deed of Trust, which was recorded and upon which Deutsche Bank is proceeding concerning the foreclosure of the McCaffrey Deed of Trust, has a date of October 13, 2009.

The Debtor was also shown a second Limited Power of Attorney, dated December 21, 2009, which retroactively authorizes certain individuals, including Ms. Erica Johnson-Seck, to execute and deliver  "all instruments of transfer and conveyance, appropriately completed," concerning the sale and transfer of an asset pursuant to a "Loan Sale Agreement, dated March

**37.** Initially counsel for Mr. McCaffrey wanted to qualify him as an expert witness at the August 11, 2010 hearing.  However, during the examination, counsel concluded that he did not need an expert witness as to Exhibits F and G and decided to have Mr. McCaffrey simply testify as a fact witness.  The Court has considered and analyzed the testimony of Mr. McCaffrey at the August 2010 and June 2011 hearings in this part of the Decision.

1    19, 2009, between the FDIC, as Receiver for IndyMac.. . and One West Bank, FSB,"[38] however,

2    there is no indication that the McCaffrey loan was within that group of assets that were sold.

3          Although the Debtor testified that he was generally familiar with Exhibit F, as a

4    fact witness, he could not provide any further information about how said document had any

5    relationship to his loan.

6          He testified, as did Mr. Rhoads, that the Note stated to be a "True and Exact

7    Copy" of the original Note was not. The Court agrees.

8          The Debtor conceded on cross examination that the last time he made a regular

9    payment on the Note was in November 2008. Although not regular payments, he made some

10    payments on the Note in 2009 when he was seeking a loan modification.[39]

11          At the hearing in June 2011, he confirmed that the VIP division where he

12    obtained his loan was completely separate from the region in which Mr. Brouillard worked. He

13    also delivered to the Court the loan file that he received at the closing of his loan. The

14    documents are essentially the same, and do not vary in any material terms.[40] The only difference

15    is that the original Note has a stamped blank endorsement on the back of Page 5 of the Note.

16          F.   The Testimony of Jessica R. Kenney

17          Ms. Kenney, an assistant attorney in the bankruptcy area at the McCarthy,

18    Holthus & Levine firm, testified on May 17, 2011. In 2010, she reviewed various documents

19    received from clients, filed motions for relief from the automatic stay, and appeared at any

20

21    **38.** Exhibit G.

22
   **39.** The Court discounts his self-serving testimony at the August 2010 hearing that
23    although not an expert concerning signatures, he did not believe that his signature was on the
   original Note and Deed of Trust. The Court has reviewed the original Note and Deed and Trust,
24    and there is nothing to indicate that these documents were not properly executed by Mr.
   McCaffrey, and as to the Deed of Trust, Mr. McCaffrey and his then wife.
25

26    **40.** The Debtor makes much of the fact that his documents are "aged" and have a
   "yellow" appearance. Yet the documents that the Court reviewed in the original loan file also
27    exhibited a similar aging.

28                      16

hearings thereon.  She filed the Motion for Relief from the Automatic Stay on behalf of Deutsche

Bank, concerning the McCaffrey loan.  She testified that the Debtor filed an objection to her

Motion for Relief from the Automatic Stay.  The Debtor and his counsel wanted to examine the

original Note.  She obtained the original Note from the servicer, One West, and the Debtor, Mr.

Rhoads, and the Debtor's bankruptcy counsel inspected the Note at her offices in April 2010.

She stated that the parties requested a copy of the original Note, including the endorsement.

Because the endorsement was on the back of Page 5 of the original Note, and Ms. Kenney did

not know how to do two-side copying, the copy or copies provided to the Debtor, Mr. Rhoads,

and the Debtor's counsel contained the endorsement as a separate page with nothing else on it.

After the meeting, Ms. Kenney returned the original Note to One West.

Ms. Kenney testified that the Debtor and other parties requested a review of the

loan file again in June 2010.  Although she reordered the loan file, she was not present at the

June meeting.[41]  After the meeting, she testified that the original Note was placed in the firm's

safe, and the firm delivered the original Note to this Court.[42]  As to the difference between the

documents that she presented to the Court concerning the Motion for Relief from the Automatic

Stay and the documents presented by Deutsche Bank during this trial, she noted that the Motion

for Relief would have been filed with just the documents from the servicing file of One West, the

servicer for the McCaffrey loan, and not necessarily the documents contained in the vault as to

the original loan file.[43]

---

**41.** Ms. Kenney stated that she did not attend the June 2010 meeting because Mr.
McCaffrey and Mr. Rhoads were confrontational.  Mr. Rhoads denied that allegation during his
testimony.

**42.** Mr. Levine stated that as an officer of the Court, the original Note had been in his
firm's safe from June 2010 through August 2010 when it was presented to the Court, and that the
Note had not been altered.  As noted previously, the Court has had the original Note in its safe
since the August 2010 hearing.  .

**43.** Ms. Kenney's testimony was credible as to the potential difference between a loan
servicer's file and the file containing the original documents which would be kept in a vault.

17

1    The Court finds Ms. Kenney's testimony to be credible.  The Court has also

2  examined the original Note, and as stated previously in this Decision, the original Note does

3  have the endorsement on the back of Page 5, the last page of the Note.

4

5                              III. LEGAL ISSUES PRESENTED

6       A. Whether the Note and Deed of Trust were validly transferred to Deutsche
        Bank.
7

8       B.  If the Note and Deed of Trust were not validly transferred to Deutsche Bank,
        what remedy, if any, is available to the Debtor.
9

10                                  IV. DISCUSSION

11      A. Whether the Note and Deed of Trust were validly transferred to Deutsche
        Bank.
12

13      According to the Debtor, Mark Fitzpatrick, whose stamped signature appears as

14  part of the indorsement in blank on the Note, did not, in fact, endorse the Note.  Therefore, the

15  McCaffrey loan could not have been properly transferred to the Trust pursuant to the Pooling

16  and Servicing Agreement dated February 1, 2004.  As a result, Deutsche Bank has improperly

17  proceeded before this Court as the Trustee under such a Pooling and Servicing Agreement as to

18  the McCaffrey loan.  Moreover, the Debtor points to the discrepancy in the location of the

19  indorsement between the original and copy of the Note, further substantiating the Debtor's claim

20  that the transfer to Deutsche Bank was not, and is not, valid. Conversely, Deutsche Bank argues

21  that IndyMac properly indorsed the Note in blank by affixing a stamp to the back page of the

22  Note, thereby transferring the Note to Deutsche Bank, as the current holder.  Pursuant to the

23  testimony of former IndyMac employees, the stamped indorsement was consistent with the

24  practices and procedure at the Bank in place at that time. Furthermore, according to Deutsche

25  _____

26  However, it is also true that someone stamped the Note as a true and correct copy, and presented
    it as an exhibit in support of the Motion for Relief from the Automatic Stay when the Note was
27  not a true and correct copy.

28                                        18

1  Bank, the discrepancy in the location of the indorsement is the result of a simple copying

2  mistake.

3  A blank indorsement on a note makes it "bearer" paper. See Mecham v. United

4  Bank of Arizona, 489 P.2d 247, 251 (1871); A.R.S. §§ 47-1201(B)(21)(a), 47-3301, 47-3205.

5  Under Arizona's version of the Uniform Commercial Code ("UCC"), an "'Indorsement' means a

6  "signature," other than that of a signer as maker, drawer or acceptor, that alone or accompanied

7  by other words is made on an instrument for the purpose of negotiating the instrument,

8  restricting payment of the instrument or incurring the indorser's liability on the instrument."

9  A.R.S. § 47-3204(A).

10  Under Arizona law, "A signature may be made . . . [m]anually or by means of a

11  device or machine; and [b]y the use of any name, including a trade or assumed name, or by a

12  word, mark or symbol executed or adopted by a person with present intention to authenticate a

13  writing. " ARS §47-3401(A).  Further, a document is "signed" if it includes "any symbol

14  executed or adopted with present intention to adopt or accept a writing." A.R.S. § 47-

15  1201(B)(37).

16  In order to qualify as a Holder in Due Course ("HDC") under A.R.S. 47-3302, a

17  party first must qualify as a "holder."  "Holder" means "[t]he person in possession of a

18  negotiable instrument that is payable either to bearer or to an identified person that is the person

19  in possession." A.R.S. § 47-1201(21);  In re Veal, --- B.R. ----, 2011 WL 2652328 (9th Cir. BAP

20  2011).  An HDC is not subject to so-called personal defenses to enforcement that the obligor

21  may raise, including some forms of fraud.  However, an HDC is still subject to so-called real

22  defenses, including fraud in the inducement (for example, a party being tricked into signing a

23  note believing it is a mere receipt).  Even though forgery is not specifically listed as one of the

24  real defenses in A.R.S. § 47-3302, it may still be a real defense to which an HDC is subject. See

25  Ingersoll-Rand Financial Corp. v. Anderson, 921 F.2d 497 (3d Cir. 1990) (finding that under

26  New Jersey law, forgery is a real defense to which even holder in due course is subject until

27

28  19

1   authenticity is established).

2          To be a "holder" a party must be in possession of the Note.  However, under

3   A.R.S. § 47-3309, a party NOT in possession of the original Note may still enforce it if the

4   original Note has been lost, stolen, or destroyed, provided that the party seeking to enforce it

5   "prove[s] the terms of the instrument and the party's right to enforce the instrument." A.R.S. §

6   47-3309(B).  As stated by the Court in <u>Veal</u>, "while the failure to obtain the indorsement of the

7   payee or other holder does not prevent a person in possession of the note from being the 'person

8   entitled to enforce' the note, it does raise the stakes. Without holder status and the attendant

9   presumption of a right to enforce, the possessor of the note must demonstrate both the fact of the

10  delivery and the purpose of the delivery of the note to the transferee in order to qualify as the

11  'person entitled to enforce.'"  <u>In re Veal</u>, at 8.

12         Deutsche Bank must show that it had some interest in the Note, either as a holder,

13  as some other "person entitled to enforce" the Note, or that it was someone who held some

14  ownership or other interest in the Note in order to show a colorable claim against the property.

15  Although Deutsche Bank has shown that it has the original Note in its possession, it is unclear

16  how and under what documentation it acquired that Note.  Deutsche Bank has argued that it is

17  proceeding as the Trustee of the Residential Asset Securitization Trust Series 2004-IndyPort1,

18  Mortgage Pass-Through Certificates Series 2004-1, under the Pooling and Servicing Agreement

19  dated February 1, 2004.  However, the Court is unable to conclude, on this record, that the

20  McCaffrey loan was placed into such a Trust.   It may be that the McCaffrey loan was indeed

21  transferred into the Trust, but Deutsche Bank should have presented evidence to reflect that fact.

22  If Deutsche Bank acquired the McCaffrey loan in some other capacity, or in some other manner,

23  it should have presented that evidence to the Court.

24         However, the problems discussed herein do not necessarily vitiate the underlying

25  debt in question.  The Court concludes that the Debtor has presented insufficient evidence, as a

26  matter of fact and law, that the original Note and other loan documents were somehow forged or

27

28                                                20

fraudulent. The Court sees no basis to absolve the Debtor of his responsibility to pay the

underlying mortgage obligation. The question is whether the Debtor should be paying Deutsche

Bank, as the Trustee under a Pooling and Servicing Agreement, or as the holder of a mortgage

loan obligation that it acquired from the FDIC or some other party.

Because the Court concludes that the Debtor has failed to show fraud, including

that the original Note or other loan documents were forged, the Note and Deed of Trust were

validly transferred to Deutsche Bank. Therefore, the Court need not consider the issue as

outlined in Part B.

The Court also sees no basis, on this record, to keep the injunction in place as to

actions that Deutsche Bank wishes to take concerning the McCaffrey loan. In determining

whether some type of injunctive relief should issue, the Court must consider the standards set

forth under Federal Rules of Civil Procedure 65 and 11 U.S.C. §105. See Matter of Baldwin, 48

Bankr. 901 (Bankr. S.D. Ohio 1985). Generally for injunctive relief to issue, the Ninth Circuit

requires "(1) a fair chance of success on the merits, (2) a significant threat of irreparable harm,

(3) a balancing of hardships in favor of the application, and (4) the public interest weighs in

favor of the injunction." Lenke v. Tischler (In re Lenke), 249 B.R. 1, 11 (Bankr. D Ariz.

2000)(citing Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 925, 937-38 (9th Cir. 1987). "A

preliminary injunction may only be granted when the moving party has demonstrated a

significant threat of irreparable injury, irrespective of the magnitude of the injury." Simula, Inc.

v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999)(citing Big Country Foods v. Board of Educ.

of Anchorage Sch. Dist., 868 F.2d 1085 (9th Cir. 1989).

The Debtor has not made a regular payment under the mortgage loan obligation

since November 2008. He has not made any payments on the loan since 2009, when he was

seeking a mortgage loan modification. As of January 8, 2010, the Debtor owed Deutsche Bank

the amount of $55,073.73 in just post-petition arrearages, or arrearages incurred by the Debtor

after he filed his bankruptcy petition. 11 U.S.C. § 1322 allows a debtor to modify the rights of

holders of secured claims, except for those claims which are secured solely by a lien on the debtor's principal residence. In this Chapter 13 case, the lien that is being challenged is on the Debtor's principal residence. The Debtor has provided no evidence of any ability, on this record, to cure the substantial arrearages owing to Deutsche Bank in any plan of reorganization. In balancing the various factors concerning whether an injunction should remain in place, the Court concludes that the Debtor has not succeeded in showing any fraud concerning the original loan documents in this matter, and the loss of the Debtor's residence through a Trustee's sale must be balanced with the Debtor's inability to make payments on the underlying loan obligation and cure any arrearages thereunder in any plan of reorganization. The Debtor has failed to make a sufficient showing to allow any injunction to remain in place.

## V. CONCLUSION

Based upon the foregoing,

IT IS ORDERED that the Debtor has failed to prove any fraud or forgery with respect to the loan documents concerning his Property.

IT IS FURTHER ORDERED that the injunction issued by the Court prohibiting, *inter alia*, Deutsche Bank from foreclosing or pursuing a Trustee's sale as to the Property shall be dissolved.

IT IS FURTHER ORDERED that the Clerk's Office shall provide notice of this order to all interested parties, and file an affidavit of service thereon.

DATED this 30th day of September 2011.

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

**BNC TO NOTICE**

22